## FEE PAID

Mark Kleiman (SBN 115919)
mark@krlaw.us
Pooja Rajaram (SBN 241777)
pooja@krlaw.us
KLEIMAN / RAJARAM
12121 Wilshire Blvd., Ste. 810
Los Angeles, CA  90025
Tel: 310-392-5455 / Fax: 310-306-8491

Attorneys For Plaintiffs/Relators
DAVID S. PHILLIPS AND BEN CHAIB

```
                              FILED
                      CLERK, U.S. DISTRICT COURT

                           6/20/24

                   CENTRAL DISTRICT OF CALIFORNIA
                   BY: _____eee_____ DEPUTY
```

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. DAVID S. PHILLIPS and BEN CHAIB,<br><br>                Plaintiffs,<br><br>      v.<br><br>LOS ANGELES FILM SCHOOL, LLC; FULL SAIL, LLC, D/B/A FULL SAIL UNIVERSITY; JAMES W. HEAVENER; DIANA DERCYZ-KESSLER; PAUL KESSLER; AND DOES 1-10,<br><br>                Defendants. | **2:24-cv-05214-SB-RAOx**<br><br>Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729, *et seq*.]**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

## I.    INTRODUCTION

1.    This is an action against Defendants Los Angeles Film Schools, LLC (hereinafter "LAFS,)) Full Sail, LLC, doing business as Full Sail University, (hereinafter "FS") James W. "Bill" Heavener, Diana Derycz-Kessler, and Paul Kessler to recover damages and civil penalties under the federal False Claims Act 31 U.S.C. § 3729 *et seq*.

2.    As more fully alleged herein, this action arises out of the Defendants' prior and continuing schemes to defraud the United States of America by knowingly presenting and making, or causing to be presented and made, false claims and statements that were material to their receipt of funding from federal student aid programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq*. ("Title IV programs") and the U.S. Department of Veterans Affairs ("the VA") benefits regulations codified in 38 U.S.C. § 3680 et *seq*.

3.    Specifically, LAFS and FS, for-profit post-secondary educational institutions, certified compliance with the "gainful employment" requirements in 20 U.S.C. §1088(a)(1)(A)(i). LAFS also certified compliance with California Education Code §94928. And both schools certified compliance with the Incentive Compensation Ban ("ICB") of the Higher Education Act ("HEA"), as codified in 20 U.S.C. § 1094(a)(20), and the U.S. Department of Veterans Affairs (the "VA") regulations codified in 38 U.S.C. § 3696(d), which mirror the ICB of the HEA, to be eligible to receive federal grant and loan dollars when in fact, LAFS was not in compliance with the ICB. The certifications were false. Heavener and the Kesslers caused LAFS' false certifications, and Heavener caused FS' false certifications.  LAFS and FS violated federally required gainful employment requirements, violated accrediting standards given by for-profit education-favorable accrediting agencies and self-financed thousands of temporary employment opportunities for their graduates through schemes with non-

1

profits and paid-off vendors to give the false impression to incoming students and federal regulators that their graduates were gainfully employed within the fields they were educated in to continue receiving millions of dollars in federal financial aid.

4.     The Relators were two of the highest-ranking management executives in LAFS history, former Vice-President of Career Development and Special Advisor to the Board David S. Phillips, and former Vice-President of Admissions Ben Chaib.  Each were employed by LAFS for 12 years and each served together on the LAFS Executive Team, a select group of 6-8 top management executives who met weekly to coordinate the operation of the institution at the direction of Heavener and Kessler.  Each had extensive contact with, and direction from, both Heavener and Derycz-Kessler on the fraudulent schemes described herein.  Each also had frequent contact with, and direction from, the Executive Team at FS.

5.     LAFS receives over $85 million per year in federal financial assistance, some $60 million through federal student loans, and over $19 million in veterans' financial aid funds. LAFS is primarily owned and controlled by Heavener and his partners (Edward Haddock, Jonathan Phelps, and Garry Jones) also own and control Full Sail University (FS) in Winter Park, Florida, and the same false claims schemes are operated at both locations.  FS receives over $377 million per year in federal financial assistance.  On information and belief, approximately $90 million of that money comes from Veterans' educational benefits.  For at least the last ten years, nearly all federal funds bestowed upon and taken in resulted from fraud with the institution using taxpayer funds to finance and facilitate multiple, temporary employment positions for LAFS graduates and through incentive payments to LAFS sales representatives (hereinafter "sales reps,") prohibited for decades.

**A Brief Summary of the Legal Requirements and How They Were Violated**

6.     Federal law specifically prohibits higher education institutions from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments….to any persons or entities engaged in

any student recruiting or admission activities or in making decisions regarding the award of student financial assistance…." *See* 20 U.S.C. § 1094(a)(20), 38 U.S.C. § 3696(d); s*ee also* 34 C.F.R. § 668.14(b)(22)(i).  The United States Department of Education (hereinafter "ED,") requires any school seeking to be eligible to participate in Title IV programs to sign a Program Participation Agreement (PPA) agreeing to abide by the program's legal requirements (34 CFR § 668.14).  The PPA includes an attestation that the school "will not provide any commission, bonus, *or other incentive payment based directly or indirectly,* upon success in securing enrollments."  ED specifies that the PPA can be revoked for "a failure to comply with any provision set forth in this Agreement, a violation of Department regulations deemed material by the Department, or a material misrepresentation in the material submitted to the Department."  This includes "all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV…"

7.      LAFS and FS violated the ICB by linking sales reps' promotions and corresponding salary increases to zealously tracked metrics in securing student enrollments. LAFS and FS set strict monthly enrollment mandates guised as "retention rates." Sales reps who met or exceeded these mandates were promoted to the next level and received salary increases.  In addition, sales reps who met or exceeded the sales quotas received special privileges, including private offices, greater flexibility from "dress code" requirements, etc.  Conversely, sales reps who failed to meet the quotas were placed on performance improvement plans to create a paper trail that would serve as a pretext and were eventually fired.

8.      Sales supervisors pressure the reps daily to increase enrollment numbers. Sales reps were trained in high pressure sales tactics and fired if they did not succeed in using them to drive enrollments.

//

9.    Both Congress and the California Legislature demand that to be eligible for federal education benefits a school must successfully train its students to land and hold jobs in the field for which they are trained.   Congress requires that a school provide "a program of training to prepare students for gainful employment in a recognized profession" 20 U.S.C. §1088(a)(1)(A)(i). California's requirements, upon which eligibility for Veteran's tuition depends, are even more specific:

> "Graduates employed in the field" means graduates who are gainfully employed in a single position for which the institution represents the program prepares its graduates, beginning within six months after a student completes the applicable educational program.  For occupations for which the state requires passing an examination, the period of employment shall begin within six months of the announcement of the examination results for the first examination available after a student completes an applicable educational program."

(Cal.  Ed. Code, § 94928)

10.    Lying about placements also constitutes marketing fraud, which was central to tricking students into enrolling.  LAFS is prohibited from:

- Overstating the availability of jobs upon a student's graduation;
- Advertising concerning job availability … unless the information is accurate and not misleading; and
- Making any untrue or misleading statement related to placement or employment

(Cal Ed. Code §94897 (b),(c), and (j).)

11.    Defendants' fraudulent contact has not been publicly disclosed as defined by 31 U.S.C. § 3730(e)(4)(A).

12.    If there has been a disclosure, Relator David Phillips and Relator Ben Chaib are each, individually an "original source" as that term is defined in § 3730(e)(4)(B).

13.    Before filing this Complaint, the Relators voluntarily submitted a confidential pre-filing disclosure statement (subject to the attorney-client, work

product and common-interest privileges) to the United States on or about May 14, 2024 containing evidence and information in their possession pertaining to the allegations contained in this Complaint.

## II.    <u>JURISDICTION AND VENUE</u>

14.    This action arises under the False Claims Act 31 U.S.C. § 3729 *et seq*. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

15.    At all times material to the time frames set forth in this Complaint, Defendants regularly conducted substantial business within the State of California and made and continue to make significant revenue within California. Defendants recruit and enroll students from California.  Defendants are thus subject to personal jurisdiction in California.

16.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because, at all times material to this Complaint.  Defendants conducted and continue to conduct business in the Central District of California.

## III.    <u>PARTIES</u>

17.    Defendant Los Angeles Film Schools, LLC (LAFS) is incorporated in California, and its sole physical campus is in Hollywood.  LAFS lives on massive federal financial assistance, some $70 million through federal student loans, and over $19 million in veterans' financial aid funds.  LAFS is primarily owned and controlled by James. W. "Bill" Heavener, Co-Chair of the Board of Directors and Chief Executive Officer.  LAFS sells multiple associate and bachelor's degrees ostensibly training students for supposedly gainful employment in careers such as animation, music production and audio engineering, digital filmmaking, "entertainment business," film, and film production. LAFS and FS are linked so tightly that LAFS' accounting and paychecks are issued from within the FS Winter Park, Florida offices. Heavener and his partners (Edward Haddock, Jonathan

Phelps, and Garry Jones) also own and control Full Sail University (FS) in Winter Park, Florida, and the same false claims schemes are operated at both locations.

18.    LAFS was created in 1999 and bought by the Kesslers in 2001.  In 2003, the Kesslers sold 75% of the school, 25% to The Heavener Company, 25% to Haddock Education, and 25% to Phelps Education West.

19.    Defendant Full Sail LLC, AKA Full Sail University is located in Winter Park, Florida and corporate filings list Edward Haddock as it's CEO. With a two-hundred-acre campus for some 9,000 students (the other 10,000 or so being online,) FS boasts soundstages, a film backlot, and over 100 studios for production and editing.  As discussed *infra,* FS offers free and below market rental rates to productions and companies in exchange for the brief "hiring" of FS graduates.

20.    Defendant James W. Bill Heavener is a Florida resident (although he sometimes lived in a home in the Hollywood Hills which he purchased for actress Gianna Simone.)  Heavener is or has been Chair and Co-Chair of LAFS, FS, the Los Angeles Recording School, and a fourth for-profit college, the Rocky Mountain School of Design.  He is a long-standing member of the University of Florida Board of Trustees, and he UF Business School and the Football Training Center are also named after him following major donations made by Heavener.

21.    Defendant Diana Derycz-Kessler is a California resident and member of the California Bar.  During times material to this case, she was President and CEO of LAFS for 16 years, stepping down abruptly in 2017 while LAFS was being investigated by the ED.  Within weeks of resigning, Derycz-Kessler (and her husband Paul Kessler, with whom she purchased LAFS and the Los Angeles Recording School) then brought a legal claim against Heavener and the other LAFS & FS partners, leaving the Kesslers with millions while maintaining their 25% share of the LAFS real estate owned by Ivar Partners, LLC, the entity co-owned by Heavener, The Kesslers, Haddock, Phelps, & Jones which purchased the

//

Complaint for Violations of the Federal False Claims Act

real estate occupied by LAFS in 2003 when Heavener and his partners formed a business partnership with the Kesslers.

22.    Defendant Paul Kessler is a California resident and the husband of Diana Derycz-Kessler.  With her, he became a major investor in and CEO of Wizard World Entertainment, LLC which was used to finance and create fake jobs so LAFS could claim it met federal "gainful employment" requirements.

23.    Relator David Phillips resides in Los Angeles, California.  After earning a BA from Duke University and an MBA in Entertainment Management at The Anderson Graduate School of Management at UCLA, he began a 20-year career in the industry as an agent, manager, and executive producer of critically acclaimed and commercially successful films and television productions.  In mid-2010, Heavener hired Phillips as LAFS' Vice President of Career Development (placement).

24.    Relator Ben Chaib resides in California.  A veteran of sales management jobs at the University of Phoenix, Career Education, Heald College and Kaplan University, he was recruited to become LAFS' Vice President of Admissions (Sales) in 2009.

IV.    **THE RELATIONSHIP BETWEEN FS AND LAFS**

25.    With both Heavener and Haddock having Director's or Co-Chair positions at both FS and LAFS it is scarcely surprising that the operations of each institution paralleled one another.

26.    In fact, LAFS' and FS' entire online admissions and education enterprise, by far its most profitable business, are both operated from within the FS campus, not on the LAFS campus. FS vice President Tamara "Tammy" Elliot (formerly Gilbert) was transferred to lead LAFS as President in 2017 and other executives, such as Rachel Travaglini, Sharon Griffith, Tom Lacroix, Matt Pengra, Ken Goldstone, Darren Millar, and James May were frequently transferred between FS and LAFS.

27.     The companies' accounting systems and financial management were closely interlinked, with LAFS having to submit its fund requisitions (called EREQS) to FS.

28.     FS and LAFS Executive team leaders participated in joint strategy retreats, Board meetings, and unified meetings with outside investors.

29.     FS and LAFS Executive team leaders cooperated closely in making a joint presentation to Heavener's business partner, the Haddock Family Trust.

30.     LAFS frequently sought and received data and direction from FS executives on marketing schemes and in creating the false appearance that the schools were complying with all gainful employment criteria.

31.     Heavener and the Kesslers went to great lengths to keep ED from learning how closely the institutions were linked.  In 2017, when an audit team from ED came to LAFS, defendants anticipated that Relator Phillips would be interviewed.  In preparation for this ED interview, Heavener and Derycz-Kessler repeatedly urged Phillips to reveal nothing about FS and/or between the relationship between FS and LAFS.  This was so vital that Phillips was asked to participate in a last-minute meeting with Heavener and LAFS and FS Board Members and owners, Haddock, Phelps, and Jones were tele-conferenced in before Phillips' ED interview to flatter and thank Phillips and make sure he did not mention Full Sail or anything that would incriminate LAFS.  When Phillips was debriefed post-ED interview by Heavener, Heavener immediately asked if FS had been discussed and reiterated how important it was that Phillips had not mentioned FS or informed ED of the operational ties between the two institutions.

## V.    LEGAL REQUIREMENTS FOR FS AND LAFS

### A.    The Higher Education Act Ban on Incentive Compensation

32.     Pursuant to Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070, *et seq.*, the DOE provides financial assistance in the form of grants,

loans, loan guarantees and interest subsidies to eligible students to help defray the costs of education. This includes the Federal Direct Student Loan Program, 20 U.S.C. §§ 1087a, *et seq*., 34 CFR § 685; the Federal Perkins Loan Program, 20 U.S.C. § 1087aa, *et seq*., 34 CFR § 674; the Federal Work Study Program, 42 U.S.C. §§ 2751, *et seq.*, 34 CFR § 675; and the Federal Supplemental Educational Opportunity Grant Program ("FSEOGP"), 20 U.S.C. §§ 1070b, *et seq*., 34 CFR § 676.

33.     One requirement of the Title IV programs is that an institution must assent to a Program Participation Agreement (PPA) with the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14(a)(1). The PPAs expressly "condition the initial and continuing eligibility of the school to participate in a program upon compliance with" the requirements of 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

34.     The statute and the PPA require that:

"The institution will not provide any commission, bonus, or other incentive payment passed directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance."

20 U.S.C. §1094(a)(20). *See also* 34 C.F.R. §668.14(b)(22).

35.     Known commonly as the "Incentive Compensation Ban," this subsection of the statute expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools not compensate employees based on success in securing enrollments.

36.     Congress prohibited incentive compensation schemes because it determined that the payments led to enrolling unqualified students who received federally insured student loans and defaulted on them at higher rates than schools without such schemes. Since the federal government guaranteed the loans, incentive compensation was tied to staggering costs to the taxpayer.

37.    "Commission, bonus, or other incentive payment" means a sum of money or something of value, other than a fixed salary or wages, paid or given to a person or entity for services rendered." 34 C.F.R. § 668.14(b)(22)(iii)(A).

38.    Institutions may make merit-based adjustments to employee compensation, provided that such adjustments are not **based in part, directly or indirectly**, upon success in securing enrollments or the awards of financial aid. 34 C.F.R. § 668.14(b)(22)(ii)(A).

39.    In each PPA, the institution certifies, "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program." The PPA then states, *inter alia*:

> "By entering into this Program Participation Agreement, the Institution agrees that…(22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance…."

40.    The ED certification to participate in the Title IV programs lasts a maximum of six years, and institutions are required to seek recertification from the ED on a regular basis to continue their participation in the Title IV programs.  An institution must also apply for recertification by the ED if it undergoes a change in control, as defined by ED regulations, and may be subject to similar review if it expands its operations or educational programs in certain ways. 34 C.F.R. § 668.13.

41.    Neither Relator worked in the Compliance Department and therefore neither had access to copies of either FS' or LAFS' PPAs.  However, since a current PPA was required for a school to qualify its students for federal loans, and since the loans were continued throughout this period, Relators assert, upon information and belief, that each school maintained a PPA at all times material to this Complaint.

Complaint for Violations of the Federal False Claims Act

**B.** **The October 29, 2010 Final Regulations**

42.    On October 29, 2010, the ED published in the Federal Register final
regulations for improving integrity in the programs authorized under Title IV of the
HEA of 1965, as amended. These rules and regulations are enumerated as 75 FR
66832 - 66975.

43.    75 FR 66876 states:

"We note that individuals may be compensated in any fashion that is
consistent with the prohibition identified in section 487(a)(20) of the
HEA…the Department recognizes, for example, that institutions often
maintain a hierarchy of recruitment personnel with different amounts of
responsibility. As long as an institution complies with section
487(a)(20) of the HEA, it may be appropriate for an institution to have
salary scales that reflect an added amount of responsibility. Institutions
also remain free to promote and demote recruitment personnel, as long
as these decisions are consistent with HEA's prohibition on the
payment incentive compensation."

44.    75 FR 66877 further clarifies by stating:

"Section 668.14(b)(22) does not prohibit merit-based compensation for
financial aid or admissions staff. An institution may use a variety of
standard evaluative factors as the basis for this type of compensation.
However, consistent with section 487(a)(20) of the HEA and §
668.14(b)(22), an institution may not consider the employee's success
in securing student enrollments or the award of financial aid in
providing this type of compensation. Further, an increase in
compensation that is based in any part either directly or indirectly on
the number of students recruited or awarded financial aid is
prohibited."

45.    Standard evaluative factors that an institution may take into account in
determining the compensation of employees include: seniority or length of
employment; job knowledge and professionalism; skills such as analytic ability,
initiative in work improvement, clarity in communications, use and understanding of
technology; traits such as accuracy, thoroughness, dependability, punctuality,

//

Complaint for Violations of the Federal False Claims Act

adaptability; peer rankings; student evaluations; and interpersonal relations. *See* Federal Student Aid Handbook, Vol. 2, Ch. 3, at 2-59, 2017-2018[1]

C.    **The November 27, 2015 Final Rule**

46.    On November 17, 2015, ED provided clarification and additional information applying to the October 29, 2010 regulations.

47.    75 FR 73992 states:

"The regulations at 34 CFR 668.14(b)(22), implementing the statutory ban on enrollment-based compensation to recruiters of students, 20 U.S.C. § 1094(a)(20), do not contain a ban on graduation-based or completion-based compensation…The Department…does not interpret the regulations to proscribe compensation for recruiters that is based upon students' graduation from, or completion of, educational programs….In assessing the legality of a compensation structure, the Department will focus on the substance of the structure rather than on the label given the structure by an institution. Thus, although compensation based on students' graduation from, or completion of, educational programs is not *per se* prohibited, the Department reserves the right to take enforcement action against institutions if compensation labeled by an institution as graduation-based or completion based compensation is merely a guise for enrollment-based compensation, which is prohibited. Compensation that is based upon success in securing enrollments, even if one or more other permissible factors are also considered, is prohibited.

D.    **Veteran's Administration Education Benefits Regulations**

48.    Unlike Title IV assistance, these are not federally insured student loans. They are direct tuition grants which the veterans are not required to repay.  38 U.S.C. §3301 et. seq.   In addition to having a lower threshold for customer buy-in (since there is no debt faced by the student or service member,) the veteran's benefits are //

---

[1]https://ifap.ed.gov/fsahandbook/attachments/1718FSAHbkActiveIndex.pdf

popular because they pay money to the school much more quickly than insured loan money comes in.

49.    Responding to anecdotal accounts of widespread fraud in the veterans' "educational" programs, in 2012 Congress added a ban on incentive compensation for sales reps (38 USC §3698(b)) that parallelled the prohibition in Title IV.  Earlier that year President Obama issued Executive Order 13607, extending to active-duty military financial assistance the same protections that were in the Higher Education Act. 34 CFR § 668.71 authorized the Secretary of Education (and by extension, the Secretary of Defense) to revoke a school's eligibility to receive financial assistance or get student loans for its enrollees. 34 CFR §§ 668.73-75 prohibited schools from lying to students about financial aid matters, the employability of its graduates, job opportunities, or the school's "knowledge about the current or likely future conditions, compensation, or employment opportunities".  Further, the schools must meet all state legislative and administrative requirements. (34 CFR § 600.9)

50.    Like the PPA, schools seeking tuition support veterans must enter into a memorandum of understanding with the Department of Defense Office of the Undersecretary of Defense for Personnel and Readiness.  Compliance with its terms is mandatory. 32 C.F.R. Pt. 68 Appendix A, ¶ 3(a)(2) and educational institutions failing to comply may be removed from the program.

51.    The schools must have policies in place that "[b]an inducements including any gratuity, favor, discount, entertainment, hospitality, loan, transportation, lodging, meals, or other item have a monetary value of more than a de minimis amount to any individual, entity, or its agents including third party lead generators or marketing firms other than salaries paid to employees or fees paid to contractors in conformity with all applicable laws . . ." *Id.,* at ¶ 3(j)(1).

52.    President Obama issued Executive Order 13607 extending to active-duty military financial assistance the same protections that were in the Higher Education Act.  34 CFR § 668.71 authorized the Secretary of Education (and by

extension, the Secretary of Defense) to revoke a school's eligibility to receive financial assistance or get student loans for its enrollees.  34 CFR §§ 668.73-75 prohibited schools from lying to students about financial aid matters, the employability of its graduates, job opportunities, or the school's "knowledge about the current or likely future conditions, compensation, or employment opportunities". Further, the schools are required to meet all state legislative and administrative requirements. 34 CFR § 600.9

53.    The Veteran's assistance program requires that the eligibility of each school must be determined by the "state authorizing agency" in the state in which the school is located, thus importing a state regulatory matrix in addition to the federal requirements.  LAFS falls under the domain of the California State Approving Agency for Veterans Education (CSAAVE).  CSAAVE's role and responsibilities are laid out in the *California Education Code* §§ 61700 *et. seq.*

54.    Since 2016 CSAAVE must also certify that the school has been approved to operate by the Bureau of Private Postsecondary Education, (BPPE) *Cal. Ed. Code* §67103(c).

**E.    Gainful Employment Requirements**

55.    Both Congress and the California Legislature demand that to be eligible for federal education benefits a school must successfully train its students to land and hold jobs in the field for which they are trained.  Congress requires that a school provide "a program of training to prepare students for gainful employment in a recognized profession" 20 U.S.C. §1088(a)(1)(A)(i). California's requirements, upon which eligibility for Veteran's tuition depends, are even more specific:

> "Graduates employed in the field" means graduates who are gainfully employed in a single position for which the institution represents the program prepares its graduates, beginning within six months after a student completes the applicable educational program. For occupations for which the state requires passing an examination, the period of employment shall begin within six months of the announcement of the

examination results for the first examination available after a student completes an applicable educational program."

(Cal. Ed. Code, § 94928)

56.    This violation is also tied to marketing fraud which was central to tricking students into the program. The school is prohibited from by (Cal Ed. Code §94897 (b),(c), and (j)

- Overstating the availability of jobs upon graduation;

- Advertising concerning job availability … unless the information is accurate and not misleading; and

- Making any untrue or misleading statement related to placement or employment.

57.    All members of the Executive Team, executives and program managers at LAFS were fully aware of the regulatory requirements.   In April of 2012, LAFS assured their accrediting agency ACCSC that LAFS, a member of the state's proprietary school association, had access to a variety of webcast seminars, and that is compliance officer routinely updates all department heads on new developments. Moreover, the CEO, Diana Derycz-Kessler, the Vice President of Operations, Jenna Langer, and Paul Bott, the Vice President for Academic Affairs, regularly attended seminars and conferences sponsored by regulatory and accrediting agencies and trade associations.  Bott is a former Commissioner of ACCSC.

58.    Just as LAFS' leaders knew what was required, its owners and Board Members knew LAFS was built on a platform of deceit.   The day before the ED audit visit in 2017, Heavener told Jenna Langer, Derycz-Kessler, and Phillips that full-time jobs did not exist for graduates of LAFS' audio recording area and unless the LAFS could sell to auditors "about a third of our business is going to disappear because full-time time jobs don't exist for these people, they don't exist."

//

## VI.    **THE FRAUD SCHEMES**

"Most [grads] report a yearly income of 0-$5,000 in their field of study "

> #1477.1, Agenda for LAFS Career Development "Jobs" Meeting

"What's the point of [getting grads] work if we cannot use it in service
  of our accreditation obligations?"

> #21080.1 Elaine Chekich, LAFS Career Development
> Production Supervisor

59.    Concerted lies to federal officials rarely occur in a vacuum.  To understand the intense financial pressure which drove the school to lie, and its profound impact on thousands of hoodwinked students and the tens of millions of dollars this cost, one must first understand why Congress demands proof of gainful employment and how LAFS gamed the system.

60.    Once the Los Angeles Recording School (LARS) fought litigation and its former instruction was absorbed into LAFS, LAFS proceeded to ramp up its audio engineering program and add a music production program to prey on thousands more students it knew would likely never become gainfully employed after graduation. Kevin Bannerman, one of the placement executives recalls that "At the beginning of 2011 . . . the market for Recording students seeking engineering work was vanishing before our eyes. (Draft of Career Development Business Plan.) The problem was worsened by the nature of the students admitted and the graduates the school had to find jobs to maintain accreditation.  At the 2016 "Jobs Meeting" managers knew that 90% of the jobs available to LAFS graduates were freelance. Worse yet, Phillips, an experienced former entertainment industry executive and agent who for twenty-five years specialized in getting clients jobs, observed the vast majority of LAFS graduates were not able to obtain entry level positions.  With BPPE and accreditation criteria requiring that seven of every ten graduates actually be consistently employed in the field they were trained in, LAFS executives

estimated that only 20% of graduates *might* be able to get work on their own, and that for 50%, the "we must engineer gigs." (*Ibid*, p. 2)

61.    LAFS was instructed by Heavener and Derycz-Kessler to focus strictly on the appearance of compliance. evidenced by management's carefully granular calculations, measuring *down to the day* how many placements had to be created to reach the 70% number for each of the LAFS programs.  And it shows that the orders came directly from Derycz-Kessler. (*Id.*, p. 1.) and Bill Heavener.

62.    Fearing the loss of its accreditation, under Heavener's direction, LAFS approached this problem through multiple fraudulent schemes to artificially prop up its placement rates by intentionally misleading both its accreditors and its current and prospective students.  Placing 70% of its graduates was essential to Heavener and he insisted upon it. When Heavener saw this could not be achieved honestly, he and the Kesslers financed productions through multiple loan-out corporations such as Jellyworks Films, LLC and First Chance Films.  Released in 2009, All Ages Night was executive produced by the Kesslers, Heavener, and Ed Haddock, and Garry Jones.



https://www.imdb.com/title/tt1081919/mediaviewer/rm1142010880/, last visited May 5, 2024.

//

63.     LAFS and FS also made a habit of repeatedly hiring industry professionals like former Warner Brothers executive turned LAFS President Thom Mount to "hire" LAFS graduates exactly as they had done before Phillips' arrival by investing in and producing multiple films with him that specifically hired LAFS and FS graduates for just a few days, long enough to claim their graduates had been "placed."  This was the primary reason the owners invested in these films—to hire their graduates so they could claim their graduates were employed-in-field and hit their placement goals when they were actually employed-in-field by LAFS' own self-financed schemes.  Second, both schools leveraged their campuses and the film and recording equipment they owned, offering it to production companies free or wildly below fair market value on condition that its graduates be hired for the most fleeting of jobs just to create a years-long façade of compliance and genuine placement.  LAFS even went so far as to change its official internal operations policy in 2016 to insist that no one, including LAFS employees, could shoot anything on its campus unless they specifically hired LAFS graduates.  LAFS was only interested in employing its graduates in temporary jobs which could be counted as a two-day placement as it had to place 35-50 graduates each month as it grew so fast. And LAFS could only afford to pay for jobs lasting two days, because even at $10-12 an hour, between 420-600 students a year could only be momentarily employed.  So, LAFS claimed that even two days of work as a production assistant, furniture mover, runner, or even showing up for a position that was not really needed would count.  LAFS then padded its records with wildly imaginative claims that its graduates actually had freelance careers.  This was necessary to sidestep traditional employment requirements by tricking or coercing LAFS graduates into signing freelance verification forms before they were paid and instructing its "artificial employers" not to pay any LAFS graduate until a freelance verification form, created by LAFS, was signed by each of them.  The schemes will be described in greater detail and the evidence for them set forth.

**A.    The Pay for Placements Scheme**

64.    Heavener, and others at his direction had set these basic schemes in motion at both LAFS and FS prior to Phillips' arrival at LAFS.  When Phillips came to work as LAFS' Vice President of Career Development (and Special Advisor to the LAFS Board of Directors,) he was quickly initiated into Heavener's habit of laundering money through the Greater Kansas City Community Foundation (GKCC) to which Heavener had donated great sums of money several years before.  At Heavener's instruction, Phillips would relay the request to the GKCC that large sums of money be funneled by the GKCC to others.  The GKCC would then distribute it, per Heavener's direction, to media and production companies which had agreed to "hire," however briefly, LAFS graduates.

65.    A variation of this model was used by the Kesslers, when on March 31, 2011 Diana Derycz Kessler reported "We have done at least 3 feature films here using our students through Jellyworks or 1st Chance Films."  On October 5, 2011, an executive team meeting discussed the fact that Ben Chaib was achieving the same results the same way: "Ben is hiring grads to film graduations and testimonials. May be hired through Jellyworks."

66.    With the growth of LAFS graduates, the GKCC money laundering turned into a large enterprise at Heavener's direction, with money going to the Fender Foundation, Kids in the Spotlight, the Montalban Foundation, Entertainment Training Through Internships (ETTI) and others to specifically finance the hiring of hundreds of LAFS graduates to inflate their placement rates, a practice which has led the shut-down of numerous for-profit schools.  In 2011, ETTI was paid $13,000 for 98 placements, and another $15,500 for yet more placements, a deal in which Heavener's accountants were directly implicated.

67.    At Heavener's direction, LAFS hired psychologist Michael Aharoni in October or November of 2011.  Aharoni began working with LAFS Career Development staff and helped develop a business plan and organizational structure

Complaint for Violations of the Federal False Claims Act

to systematize a plan to create fully 50% of the supposed "jobs" through what were euphemistically called "In-house Production Opportunities" and "Post-Graduate Apprenticeships." In truth, both categories of "jobs" were paid for by LAFS (and perversely – were paid for with the money LAFS got from the federal government via insured loans or Veteran's education benefits.) Heavener and Derycz-Kessler reviewed nearly all the communications surrounding the business plan's formation.

68. From 2010-2017, LAFS paid nearly a million dollars to production companies that would "hire" LAFS graduates, typically for two days, and LAFS was on track to pay another $360,000 for 2017. Given that the Ivar Music Group was paid nearly half of that money for orchestrating placements on the LAFS campus, defendants' intentional concealment of this relationship from ED is especially egregious. Most significantly, it is the Ivar Music Group contract that LAFS was most careful about concealing from the ED audit team before and months after their LAFS visit because Heavener and Derycz-Kessler knew that if this contract was exposed, it would most certainly terminate LAFS' Title IV and Veteran's benefits.

69. The language written into contracts and agreed-upon arrangements with vendors was built in and/or in cases intentionally camouflaged to specify how many LAFS graduates would be hired in exchange for LAFS' financial support and/or quid pro quos. In September 2011, LAFS paid $55,000 to sponsor the 3D Film Festival to have 40 of its graduates getting temporary work even though they had no chance of turning these few hours of bought-and-paid-for "employment" into reasonable and sustainable employment. This was done at the direction of and with the full knowledge of Heavener and Derycz-Kessler, both of whom were involved in the email chains discussing and confirming these arrangements.

70. Similarly, in August of 2013 LAFS promised one vendor, IES, that it would sponsor a film festival by donating $30,000 in cash and 5 days of use of the LAFS-owned Ivar theater, rent free (valued at $25,000). In return, IES would hire whatever 100 graduates LAFS needed placed.

71.    The alternative to outright cash bribes was to use the Ivar Theater and the LAFS campus to offer free or below-market rental rates for space and equipment to shoot on campus, in exchange for "hiring" whatever graduates LAFS sent them. The entirely bogus nature of these "jobs" is glaringly apparent.  In what other environment does the employer have almost no say in *whom* they hire?  Yet that is precisely the case here as Phillips, under constant pressure from Heavener to get LAFS graduates hired within specific reporting deadlines to hit 70%, was instructed by Heavener to insist LAFS had to have complete control over the hirings to meet its placement criteria since LAFS cared only about the current cohort of LAFS graduates it needed to place right then, not any alumni who were out of school past eighteen months and had already been reported upon, because LAFS did not have to report on any graduates beyond the current unplaced cohort.  For example, in June 2015, SKEE TV prepared to walk away from a contract, complaining:

> "[W]e cannot simply employ grads to fulfill a job placement requirement for LAFS with such high turnover and no value to our growth. This model is ineffective for all three sides including the graduate."

72.    The "high turnover" was also directly required by LAFS which would only allow two days of "employment" so it could maximize the number of graduates it claimed had "jobs".  This was a frequent source of tension.  In April 2015, LAFS' Compliance Director, Mark Debacco inserted language in yet another contract, explaining:

> The contract looks fine, except that unless you are otherwise confident, may I suggest verbiage that gives us control over who they engage as opposed to just "LAFS Graduates". I've added some verbiage to article 5 that attempts to accomplish this. It is similar verbiage that I put in the Tom Tran deal, which came in handy when they didn't want to hire who we gave them.

//
//

Complaint for Violations of the Federal False Claims Act

73.     The tension between the needs of the vendors, productions, and LAFS' effort to "place the unplaceable" continued.  In December 2016, Phillips insisted "a daily graduate hire commitment . . . is the single most important factor for us," and pushed a small production company to hire "10 PAs per day (even if they have limited responsibility)".  That same month, LAFS insisted that if the production company insisted on a five-day stint for the graduates, instead of LAFS' preferred two-day rotation with another group coming in for another two days, the company would have to agree to further "hires".  LAFS' unrelenting approach also diminished whatever value there might possibly have been for the veterans who were graduating.   In March of 2015, a comedy event wanted to hire veterans who had graduated, yet LAFS insisted that the production had to accept whoever LAFS sent them.  Similarly, in December 2015, Phillips had to insist that with one Skee production contract the graduates "hired" by Skee would be whoever LAFS chose to send them, and that even though they had graduated LAFS, they could not be placed in positions of responsibility – only "supportive roles"  so that Skee, after agreeing to pay for the "LAFS graduates who had been thrust upon them," would still have to hire its own production assistants, sound technicians, lighting technicians, and camera operators.

74.     LAFS knew these arrangements were highly suspicious and worked to conceal them so it could deny it controlled these "hiring" arrangements.  In April 2017, just before a Department of Education audit, Phillips, at the direction of Derycz-Kessler and Heavener, assured LAFS' Vice President of Operations Jenna Langer, who was not aware of, nor informed of these arrangements at Derycz-Kessler and Heavener's insistence, "[W]e don't have any written quid pro quo agreements like that anymore … no one gets paid directly to hire anyone directly." In May 2017, with the Department of Education auditors barely out the door, DeBacco directed a revision to yet another contract, remarking:

"Please remove from the document the verbiage, '4 graduate student PA's will be hired by the production at $150/day per hire through payroll.' Where we appreciate Sneak Preview's willingness to engage LAFS graduates and where we believe you will find LAFS graduates well prepared for entry level on set positions and where we encourage Sneak Preview to engage LAFS graduates whenever you find the need for trained filmmakers (our Career Development Department is always ready to hook you up with some appropriate personnel to meet your needs), it would not be appropriate for the contract to specify same."

75.    Even more telling was the second deletion:

"Paragraph 7, LAFS does not own the Ivar Theatre. Ivar Theatre is owned by a holding company whose ultimate ownership is the same as the ultimate ownership of LAFS. LAFS leases the Ivar Theatre from the aforementioned holding company and LAFS holds sufficient right to enter into the agreement with Sneak Preview. . ."

*ibid.*  This was part and parcel of the Ivar Music scheme which created fake placements for nearly a third of all LAFS graduates from 2010-May, 2017.

76.    LAFS had to conceal its largest "pay for placement" relationship with Ivar Music Group (formerly known as Heavy Harmony, which both received LAFS funds and hired and paid LAFS graduates).  LAFS used these two cut-outs to pay for hundreds of fake "jobs" which it financed with the federal money pouring into its coffers.  LAFS controlled who to hire, when to hire them, what they would be paid, how much they would be paid, and even whether they would be paid (conditional upon their signing LAFS' "Self-Employment Verification forms.)  To achieve this LAFS financed a music publishing lab for the sole purpose of creating hundreds of fake jobs, "employing" graduates for two days so LAFS could report "success" to its accreditor.  From 2013 to 2015, LAFS paid Heavy Harmony (and later its related company, Ivar Music Group,) $120,000 a year to create "jobs" for over 550 LAFS graduates.

//

Complaint for Violations of the Federal False Claims Act

77.    LAFS' 2013 first "arrangement" with Heavy Harmony could not have been more blatant as evidenced by the agreement drafted by VP Mark Debacco per Derycz-Kessler.  Heavy Harmony was paid $10,000 per month to hire and pay 12-18 LAFS graduates for two-day jobs.  In 2015, this arrangement morphed into a written contract with the Ivar Music Group, also owned by Grimaldi, after Heavener and Derycz-Kessler met with and ordered Grimaldi to create a different sister company (which would become Next Level) to avoid the appearance that LAFS was directly paying money to the same company paying the LAFS graduates.  Derycz-Kessler explained to Grimaldi and to Phillips in order to execute the new deal with Ivar Music Group, LAFS needed this to hide the flow of money from LAFS to the ostensible "employer" which it had not done when Heavy Harmony hired LAFS graduates.  The 2013 agreement draft between LAFS and Heavy Harmony specified that the money from LAFS was used to pay graduates $25 per hour for up to 8 hours of work.  And the work had to be performed over a two-day period to create LAFS' colorable "placement" claim.  In 2016, when LAFS needed more audio and music production graduates hired to reach its placement goals, these monthly payments to Ivar Music Group sometimes spiked to $13,500 per month if Next Level "employed" up to 24-36 graduates.

78.    But midway through the contract revisions, LAFS apparently decided that even the ruse of having Ivar spawn Next Level (so Next Level could pretend to "employ" the graduates,) was not enough protection.  Although the arrangement evidenced in the 2013 draft contract was the *de facto* operative agreement, the written contract with Ivar Music Group was sanitized to avoid any admission of the pay for placement scheme.  Beginning in December 2014 or January 2015, the old contract was slowly sanitized so that the final version read:

//

//

//

Complaint for Violations of the Federal False Claims Act

behalf of LAFS focused on the subject of music publishing. LAFS shall designate adequate staff as needed to work with IVAR staff. IVAR is responsible for the development and design of curriculum, with input from appropriate IVAR staff and subject to the approval of LAFS, intended to meet the objectives and goal of providing LAFS's graduates with sufficient knowledge and skills for entry level work in the music publishing industry. IVAR is responsible for the setup and configuration and maintenance of Educational Assets – Training Equipment as well as the engagement of and management of the necessary Educational Assets – Faculty required to operate and deliver the curriculum. IVAR is responsible for the operation and delivery of the workshop curriculum to the designated LAFS graduates in a manner and sequence as required by LAFS in order to meet the objectives and goal of providing LAFS's graduates with sufficient knowledge and skills for entry level work in the music publishing industry.

delivery of the intended curriculum. IVAR will also be granted free use of the Ivar Theatre at LAFS to bring in productions which will seek to hire LAFS graduates whenever possible, such grant shall be subject to availability based upon LAFS class meetings schedule as well as third parties which LAFS may book into the Ivar Theatre from time to time. This includes use of the Brick Box VIP area, main room and

79.     Although LAFS disguised the fake job creation scheme behind phrases like "providing LAFS' graduates with sufficient knowledge and skills for entry level work in the music publishing industry," the contract admits that the graduates hired for the workshop were still controlled by LAFS since those hired are still "designated LAFS graduates in a manner and sequence as required by LAFS." *ibid*.

80.     Despite the outward-facing disguise, LAFS boasted of this job creation internally to its employees. A slide deck prepared for an all-employee meeting in February, 2015 tells the real story:

The IVAR

Objectives:
•Education Live Sound
•Music Community
 & Events
•Graduate Job Placement

81.     And the "pay for placement scheme continued unabated, with LAFS using its cut-out, Ivar as the bait: "Ivar will also be granted free use of the Ivar Theatre at LAFS to bring in productions which will seek to hire LAFS graduates whenever possible" (according to a March 9, 2015, agreement signed by Defendant Diana Derycz-Kessler). At this February 11, 2015, all-employee meeting, LAFS boasted internally of all its graduates "hired" by the companies LAFS was bribing for this very purpose – including Skee, Wizard World, Heavy Harmony, etc.

Derycz-Kessler continued in this vein signing yet another pay for placement contract with Wizard World the very month of the ED audit team's visit.

82.    LAFS could make this boast because, as Phillips described, the Ivar Music Group scheme went on exactly as before, with LAFS selecting grads to be hired based solely on the school's placement needs, stretching out two days of paid work over weeks.  And just as Heavy Harmony did before, Next Level withheld the "employees' pay" until they signed the "Self-Employment Verification" forms LAFS demanded of them.  In January of 2015, Derycz-Kessler had been personally involved in Skee's contract trading space at the Ivar for guaranteed brief-sting "hiring" for LAFS graduates.

83.    Heavy Harmony was founded and owned by George Grimaldi, a former Sony Music executive who owned a contemporary music library (music that is produced to be used in film, television, or radio.)  Grimaldi began working for LAFS as an independent contractor in 2013.  In 2014, Derycz-Kessler, LAFS' President and Chief Executive Officer, told Grimaldi, "You cannot be part of the school" and instructed him to establish two independent companies, one to receive money from LAFS, and the other to use some of that money to pay wages to the hundreds of graduates who were briefly employed there.  Again, an email from Debacco tells the tale.  On January 7, 2014, he wrote to Phillips:

> "I don't see Ivar Music in the California Secretary of State's database of business entities. But I do see Heavy Harmony. See below. I assume it is still Heavy Harmony and the name change to Ivar Music has not been processed yet.  Is the below our Heavy Harmony and is it a business entity "we" control?  . . . Is the below the entity in question and do we have control of the entity sufficient to obtain insurance coverage on behalf of the business entity."

84.    As with the other companies, Heavy Harmony and Next Level had no control over whom it "hired."   LAFS would send Grimaldi its list of hires for the week who needed to be placed (the ones in a specific cohort to be reported on

eighteen months after their graduation from LAFS, and Grimaldi would hire them no questions asked.  No other students from any other school other than LAFS were to be hired, and these LAFS graduates did not have to even interview for these opportunities—their hiring was 100% guaranteed.

## B.    Pretending the Graduates Have Sustainable Freelance "Careers"

85.    Heavener, Derycz-Kessler, Aharoni and other executives knew LAFS' claims about freelance careers would not stand up to scrutiny.  As early as February 2012, LAFS Vice President of Operations Jenna Langer was suggesting to Heavener, Derycz-Kessler, and Phillips that before evidence of graduate "self-employment" was submitted to ACCSC for review, "placement records reflecting 'self-employments' **will have no actual dates of employment listed, just 'self-employment' written on them."**   Also, "**Updated photocopies** (not masters) of docs that were **originally flagged as potentially problematic**' will be provided …" Jenna Langer and "Compliance" Director Mark Debacco also directed that CD staff "update" graduates' resumés when a "placed" graduate had "helpful information that could simply look good.  Pursuant to January 2012, instructions from Derycz-Kessler, much of this was done at her direction.

86.    Under pressure from Heavener, LAFS kept lowering the bar for "proof" that its graduates were somehow self-employed.  In August of 2013, the former head of ACCSC, who was then an LAFS consultant pronounced that if  "we have made and documented multiple attempts to contact graduates to no avail, but have evidence that they are in fact working, then we should document that and count them as placed."

87.    By 2014, LAFS was listing one and two day "jobs" with its "pay for placement" partners as evidence that a graduate's employment was "sustainable." LAFS elected to interpret the ACCSC Guidelines for Employment Classification, Appendix VII of ACCSC' Standards of Accreditation as meaning that two days of employment was somehow evidence of reasonable sustainability.   And as noted,

27

*supra*, the "jobs" invoked by LAFS were not jobs in any sense of the word. The graduates did not apply, were not interviewed, and did not go through a hiring process. They simply showed up when and where LAFS officials told them.  And as also noted *supra*, the graduates were kept from being asked to take on any real responsibilities, and frequently worked moving furniture, painting sets, or working on "crowd control", none of which made use of their purported training in the technical aspects of film production, animation, or audio engineering as revealed by 2015 email exchanges between a vendor and Career Development, and a 2016 database compiled by Career Development.  This has long been standard procedure. In 2012 one graduate was counted as employed because he had a "front of the house" job in a comedy club. "Front of the house" is an industry term for an audience-facing position, taking tickets, preparing or serving drinks, etc.  In 2016 LAFS' Director of Alumni Engagement, Joe Byron estimated that only 20% of the graduates were actually employed in the industry.

88.    Integral to this scheme was forcing, and in most cases simply tricking graduates to sign forms claiming that they had actively embarked on "careers" seeking freelance work. LAFS desperately needed a scheme to create evidence of "self-employment" so LAFS compliance executives developed a form they insisted everyone in Career Development use and give to employers to pass out to LAFS graduates.  In 2012, LAFS would count a graduate as placed if there was "any evidence at all that they were working", or even trying to get work. In addition to lying, LAFS sometimes resorted to outright trickery.  In a 2012 email exchange that included the compliance manager, Debacco, an LAFS "advisor" wrote about that:

> I need to be sneaky with this and have her quickly sign whatever we need all in one shot when she first arrives. Once she signs what we need I'm going to inform her there is no job for her and that threats/ultimatums don't work out so well in the real world.

//

89.    George Grimaldi of the Ivar Music Group and Heavy Harmony has confirmed that LAFS controlled the graduates he "hired" were told (after traveling to the LAFS campus  for "fake work" and before they ended the seminar on the LAFS campus) that they would not get their two-day paychecks unless they signed LAFS forms claiming "I have continued to pursue freelance opportunities which are related to the training which I received. [¶] By pursuing freelance work, I am continuing to progress toward achieving my career objectives.  I am taking steps toward building a client base, and I am earning income from industry-related services rendered."

**C.    2017 False Statements to United States Department of Education**

90.    To survive, LAFS repeatedly lied on the Program Participation Agreements which require LAFS to attest that it was not paying incentive compensation to the sales force.  It then had to maintain those lies to an ED audit team that visited the school in May, 2017.

---

**From:** Cupp, Jason
**Sent:** Wednesday, May 3, 2017 2:09 PM
**To:** McAuley, Patricia <Patricia.McAuley@ed.gov>
**Cc:** Espinosa, Adeline <Adeline.Espinosa@ed.gov>
**Subject:** Response to Follow-Up Question on Employer Agreements

Patricia,

Thank you for the recent e-mail and we are happy to provide additional information regarding various arrangements LAFS had with entities from 2014-2016. As we mentioned in our most recent submission, LAFS does not have any agreements with employers or potential employers that involve payments related to the placement of graduates and similarly had no such arrangements during the referenced period. However, the school has entered into various

program advisory/support efforts. None of these arrangements contemplated any direct hiring by these individuals and there is no expectation for them to do so. In addition to Dan Morrell (d/b/a Mix Mastered Studios), Del Breckenfeld (d/b/a Music Depot) and Simone Bartesaghi (d/b/a Siba Media), described in the prior submission, LAFS also utilized the occasional services of the following from 2014-2016: Joe Mazzone (d/b/a Another Music Library, LLC), J4U Entertainment, Inc., the Ricardo Montalban Foundation, and Adrian Ross (d/b/a Media Music Productions) during the 2014-2016 period.  Due to time constraints involved in compiling information for the latest request, we have not discussed all the details for each, but are happy to discuss before, during, or after the upcoming visit.

---

//

//

Complaint for Violations of the Federal False Claims Act

91.     This was entirely untrue.  Less than four months before this email to ED LAFS President and CEO Derycz-Kessler signed a contract with ABC stating:

10.1 To help Producer with the Production, as a minimum, Producer agrees to retain the services of the Los Angeles Film School's Graduates pursuant to a separate Agreement between Producer and the Graduates and according to the following schedule:

LAFS ABC Final Executable

Date(s): January 20, 24, 25, 26 & 27, 2017; # of Graduates: 10 (*over the course of the 5 day shoot*) @ $112.00 per day.

And

Date(s): TBD; # of Graduates: 15 (*for 2 days each, within 90 days of shoot dates, on any other ABC shoot at any location*) @ $112.00 per day.

92.     LAFS continued to lie to the ED auditors.  Before arriving at LAFS the ED requested additional information about any "arrangements or agreements the school had with employers or potential employers", its claimed gainful employment statistics, and the length of employment behind each claim.  The school claimed that "[w]ith respect to regular employment, LAFS typically requires that the graduate be employed for at least a week to be considered sustainable for reporting to ACCSC." Although the school admitted that it considered two days of work sufficient for the "self-employed" graduates, it specifically hid the hundreds of jobs LAFS bought through its "pay for placement" scheme.

93.     Although LAFS never stopped lying to ED, they did accelerate their evasive actions.  Executives laid the groundwork for this before the auditors arrived. On April 28, 2017, "Compliance Director" Debacco claimed to have "just learned" LAFS had been improperly counting many students as self-employed based on rumors instead of signed attestations from the graduates.  In June 2017, Phillips was forced out of his Vice President/Special Advisor to the Board of Directors role by Heavener immediately after the ED visit in May 2017 and given an "LAFS & FS

Board-identified consultant role" which removed Phillips from all oversight of Career Development but preserved his salary, benefits, office, and staff support. LAFS President & CEO Diana Derycz-Kessler resigned from both roles on July 14, 2017 (as she feared losing her law license and was certain million-dollar fines and closures for LAFS and FS were imminent.) This was confirmed to Chaib by LAFS Vice President of Operations Jenna Langer who told Chaib "Diana resigned to save her law license because she authorized LAFS to buy all those jobs for LAFS graduates for so many years with government funds, and her and the owners needed Dave to be the guy they blamed their schemes on."

94.    Nor did this stop after the audit. In 2019, Phillips reported to Tammy Elliott that "Angelia worked with from the Music Supervisors' Guild to book 40-something "2 day" gigs by utilizing our facilities which still afforded us hires when needed…" George Grimaldi recently learned this year, in May 2024, from a current LAFS employee in Career Development, that LAFS' pay for placement deals still exist on the LAFS campus with the Music Supervisors Guild under LAFS President Tammy Elliott

95.    LAFS' deception continued notwithstanding (or in conjunction with) these cosmetic changes.  After the ED audit team left, it followed up with some document requests based on information LAFS gave to the auditors.  It could not, however, follow-up on the information purposely withheld from them.  Although a number of the arrangements with pay for placement vendors were listed by LAFS, **Ivar Music Group**, by far LAFS' largest vendor accounting for approximately 137 LAFS "two-day" audio graduate hires per year, which received the most money from LAFS and generated the most placements for them, was missing from LAFS' disclosures to the ED.  Phillips was instructed by LAFS to say nothing to ED of this particular relationship during interviews, and LAFS submitted nothing before or after the ED visit to the ED which would have clearly disclosed LAFS' contractual relationship with Ivar Music Group to receive LAFS funds to train, hire, employ,

and verify payment to hundreds of LAFS graduates on campus from 2015-2017.  In addition, four months later, in October, 2017, Heavener emailed Phillips, then  a consultant with LAFS, to personally request Phillips check his files and send him any evidence that could be used for ED discovery that mentioned "every CD vendor" LAFS dealt with from 2013-2017, **except** Ivar Music Group and George Grimaldi, were both intentionally removed from the list to be provided from LAFS to the ED, again, as LAFS was betting on the ED not discovering them any connection between Grimaldi, the Ivar Music Group, and Next Level.

96.      On information and belief that in presentations and correspondence to ED, LAFS specifically avoided mentioning anything about the Heavy Harmony arrangement and the Ivar Music Group contract which were financed by LAFS through the use of over $1 million in federal funding as line items in yearly Career Development budgets approved by LAFS, Heavener, and Derycz-Kessler which disclosed and proved the exact nature of the consistent pay-for-play hiring schemes conducted directly from the LAFS campus.

**D.      LAFS Has Violated the California Education Code and Had BPPE Known the School's Operation  Would Not Have Been Approved, Leading to a Loss of CSAAVE Certification**

97.      Since 2016 the CSAAVE for veterans must also certify that BPPE has approved the school.  This depends upon the school's compliance with the California state regulatory scheme.  LAFS has falsely claimed compliance with state requirements.  First, the California Education Code prohibits:

- Overstating the availability of jobs upon graduation;
- Advertising concerning job availability … unless the information is accurate and not misleading; and
- Making any untrue or misleading statement related to placement or employment

(Cal Ed. Code §94897 (b),(c), and (j)

98.    LAFS former VP of Admissions Chaib reports that the sales reps were told they could tell students anything about placement rates that was in LAFS' submissions to ACCSC.  But the ACCSC submissions did not include the information that most of the "gainful employment" reports were based on LAFS' paying people to "employ" the graduates, or that the average industry-related income for graduates was estimated to be $0-5,000 per year, or that the graduates were not legitimately hired for the two-day "jobs" the school paid for, or that many of those "jobs" did not involve doing any of the work for which they had been supposedly trained.

99.    Similarly, LAFS falsely claimed to be complying with 5 Cal. Code of Regulations §7112(d)(3)(C) which allowed it to claim credit for a placement if:

> "The graduate is self-employed or working freelance as reasonably evidenced by, but not limited to, a business license, fictitious business name statement, advertising (other than business cards,) website, or business receipts or other evidence of income from business; or an attestation signed by the graduate of self-employment or freelance work and dated after graduation."

100.    Forcing graduates to sign an attestation by withholding "pay" from them unless they did so, or by otherwise tricking them into signing is not reasonable evidence that the graduate is working freelance. Concealing these facts was material to BPPE's continued tolerance of LAFS, without which it CSAAVE certification and Veterans' benefits would have been lost.

**E.    The Incentive Compensation Ban Scheme**

> Dana and Bill, I will send you start performance for the reps via txt not email . . . We need to remember safe harbors were removed and we do not want email asking for start numbers when considering compensation.
>
> Ben Chaib to Bill Heavener, 2015

101.    Defendants LAFS, Heavener, and both of the Kesslers violated ICB, as codified in 20 U.S.C. § 1094(a)(20), and of the VA regulations, as codified in

38 U.S.C. § 3696(d), (collectively, "the ICB") by linking sales reps' promotions and corresponding salary increases to their success in securing student enrollments. LAFS set monthly enrollment quotas and sales reps who met or exceeded them were promoted to the next level and received a salary increase, in addition to other employment perks (casual dress, private offices, eligibility to work highly paid overtime hours, etc.)  And reps who failed to meet the quotas were demoted or eventually fired.

102.    Incentive compensation schemes for schools receiving Title IV support have been illegal for over thirty years.  Congress banned them after receiving numerous reports that sales reps were wildly misleading potential customers so they could earn commissions for enrolling them.  Efforts to disguise incentive compensation have been at the heart of numerous private school FCA cases, and ours is no exception.  Relator Ben Chaib, former Vice President of Admissions was recruited, *inter alia*, to LAFS for this purpose.  Chaib's extensive experience with these schemes in the for-profit school industry began in 2001.  By the time he reached LAFS in 2008 he had worked for University of Phoenix which only bonused and promoted its sales staff based on enrollments they sold, called "starts"[2]. Although sales reps were nominally evaluated on various "soft skills," none of them mattered. The real criteria for bonuses, salary increases, or promotions was a sales rep's start performance.  In 2004, Chaib moved to Career Education Corporation's American International University division. There, Chaib reports, salaries would be increased or decreased at least twice a year, again, based primarily on starts.[3]  Chaib

[2]  The University of Phoenix paid $80 million in 2009 to settle a declined *qui tam* action, including $67.5 million to the United States with another $12 million in attorney's fees.

[3]  In 2019 Career Education Corporation resolved a false claims case that was pursued by a team of state AGs. CEC waived its right to collect nearly $500 million in student debt, paid the states $10 million, and another $22 million to relators' counsel.  Federal involvement appeared minimal as ED's leadership included ED's General Counsel who had represented CEC, the Acting Undersecretary of Education had been a senior Vice President, and a senior advisor to the Secretary had been CEC's Vice President of regulatory operations.  In April, 2024 the United

then went to Heald College, whose sales operation was quite similar, and then to Kaplan University.[4]

103.    A headhunter for LAFS recruited Chaib away from Kaplan for a meeting with Heavener and the Kesslers at the Beverly Hills Hotel.  At Heavener's direction, LAFS hired Chaib and instructed him to build and disguise an incentive compensation program at LAFS.  The goal was to maximize profits above all else.

104.   As directed, Chaib, and his then-wife, Amber Chaib, who was hired as a high-ranking sales executive, proposed to Heavener a five-level pay scale with salaries ranging from $45,000 to $90,000 per year, with "Starts Required to be Promoted" as the sole criteria, ranging from 45 to 105 "starts" every six months until 2011.  After July 2011 the criteria to be promoted were changed to 120 to 210 starts per year.  This meant that even a low-lever "Rep 1" was generating $1.9 million in tuition money, and the highest paid reps were generating $4.5 million in annual sales.  Although LAFS mimicked CEC and the University of Phoenix by claiming to evaluate reps by many other criteria, just like those defendants, enrollments were the only thing carefully tracked and the only thing that mattered. Reps whose enrollment pace faltered were swiftly demoted or fired, and it was made clear to them that the demotion was based on their sales statistics. The stratification was rapidly implemented.  Although sales reps could theoretically earn "merit increases" that were at least partially based on their "soft" skills, those merit increases ranged from 0% to 5% of salary, so a rep earning $50,000 per year could get an extra $0-2500m meaning they could get nothing.  The merit increases paled

---

States intervened in an incentive compensation case, United States ex rel Hitrost, LLC v. Study Across the Pond, LLC, et. al. 1:21-cv-10274, D. Mass.

[4] In 2015 Heald settled its FCA case for $30 million, although it was based on falsified employment statistics, not illegal sales incentives.

in comparison to the $10,000 – 24,000 set increase at each level, which looked like this:

## Starts Required to be Promoted

| Admission Rep I to Admissions Rep II | Admission Rep II to Senior Rep | Senior Rep to Master Rep | Master Rep to Executive Rep |
|---|---|---|---|
| 60 | 75 | 90 | 105 |

**The Promotional Salary Ranges for each job level are:**

| Level | Promotional Salary Range | | |
|---|---|---|---|
| Admissions Rep I | $ 45,000 | to | $ 54,000 |
| Admissions Rep II | $ 55,000 | to | $ 64,000 |
| Senior Admissions Rep | $ 65,000 | to | $ 74,000 |
| Master Admissions Rep | $ 75,000 | to | $ 80,000 |
| Executive Admissions  Rep | $ 81,000 | to | $ 90,000 |

And in the fall of 2017, after the ED audit, it was raised to:

**The Salary Ranges for each job level are:**

| Level | Salary Range | | |
|---|---|---|---|
| Admissions Rep I | $ 45,000 | to | $ 57,000 |
| Admissions Rep II | $ 55,000 | to | $ 69,000 |
| Senior Admissions Rep | $ 67,000 | to | $ 87,000 |
| Master Admissions Rep | $ 85,000 | to | $ 99,000 |
| Executive Admissions  Rep | $ 95,000 | to | $ 123,000 |

//

//

105.    In July of 2011, with the elimination of "safe harbors" that LAFS felt allowed it to get away with incentive compensation, Chaib, at Heavener's direction, issued a new compensation policy that was exactly like the previous one, but simply eliminated mention of the start requirements as *the* criterion.  But as shown by his 2015 warning to Heavener, starts – and only starts mattered.  Closer regulation of compensation practices barred schools from adjusting a rep's supposed "salary" more than once a year to reduce the effective pressure from disguised incentive compensation schemes.  But LAFS circumvented this with its "overtime" program. Reps that were meeting their sales quotas – at whatever level, were allowed to work 5 hours of overtime per week, or 260 hours per year, earning 150% of their hourly wage.  For even a Level I rep earning $20 an hour, this was an extra $5,000 per year. Reps who failed to meet their sales quotas would lose their right to overtime, which was an immediate goal to increase starts, even before they were demoted or fired.

106.    The incentive compensation system was so integral to the sales effort that it was used on the managers as well in an incentive structure mirroring the illegal incentives for the sales reps.  Managers would be promoted or demoted based solely on their team's sales performance.  Although "enrollment managers" could legally be the targets of incentive compensation based strictly on sales results ("starts,") aggressively doing so guaranteed that they would closely manage the sales reps under them to ensure that only sales results would be rewarded, and only their lack would be punished.

107.    Perversely, even ostensible compliance efforts were turned into weapons that protected the most effective high-pressure sales reps and punished the less effective ones.  When regulatory changes made it riskier to demote less aggressive reps, Heavener's solution was to fire them instead.  Heavener would demand of Chaib, "Why are these people still here?  They're not hitting their numbers. You should get them off the team."  Chaib explained to Heavener that they

//

could not fire people just "for numbers only" so LAFS devised a scheme to use one of its few compliance tools to find pretextual reasons to fire them.

108.   LAFS had a system for covertly monitoring sales calls.  Although LAFS claimed in a self-evaluation report to ACCSC that every sales rep had at least one call monitored each week, this was untrue.  Enrollment managers would target the calls of low-sales reps and monitor them, waiting to detect some violation of policy which they would then seize upon as a pretext to fire the rep and hope that the replacement was more aggressive.  Since the high-selling reps went unmonitored, the tricks they used, and half-truths they told, went undetected and uncorrected.

109.   Because these tactics are wildly successful, Heavener continued to pressure the sales department, demanding reports on a daily basis to remind his managers that past performance matters little – only today's results will save them.

110.   Heavener and Derycz-Kessler continued their own active involvement in, and direction of, these manipulations.  Just two weeks after the ED audit they were reviewing and approving reports of ongoing plans to reduce the bonuses of sales reps who were not meeting their quotas after their prior sales exploits won them promotions.

## FIRST CAUSE OF ACTION

### 31 U.S.C. § 3729(a)(1)(A)

### False Claims

111.   Relators repeat and replead each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

112.   As set forth above, from at least 2010 to the present, and ongoing, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the FCA 31 U.S.C. § 3729(a)(1)(A).  Specifically, Defendants knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA, in,

inter alia, their PPAs, in order to obtain eligibility to participate in Title IV programs and receive Title IV funding, when in fact Defendants' gainful employment practices and compensation practices did not and do not comply with Title IV of the HEA and its associated regulations in ways set forth in this Complaint above.  In signing the PPAs, a duly authorized director or agent of LAFS and FS, at the direction of Heavener, Diana Derycz-Kessler or Paul Kessler, expressly certified that the FS or LAFS "will not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of title IV, HEA program funds." These certifications were false because FS and LAFS, jointly and separately, created fake jobs to falsely represent each school as meeting gainful employment standards and promoted and gave corresponding salary increases, demotions, and terminations of sales reps based in part, directly, or indirectly, on their success in securing student enrollments.

113.   The Defendants also knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of the VA to obtain GI Bill benefits and other VA education benefits listed herein in, inter alia, their application to the SAA, when in fact Defendants' compensation practices did not and do not comply with VA regulations banning incentive compensation and in fact lied about LAFS' gainful employment achievements in ways set forth in this complaint.

114.   The Defendants knew they were paying employees based on their success in securing student enrollments and paying others to temporarily employ their graduates and that their representations to the Government were false. Defendants' claims for Title IV funds and VA education funds based on these false representations are fraudulent.  When the Defendants request, receive, and retain Title IV funds or VA education funds, Defendants know they are ineligible for those funds because of their intentional violations of the ICB.

115.    These fraudulent representations were material to the ED's and the VA's decision to make FS and LAFS eligible for these financial aid programs as well as GI Bill benefits and other VA education benefits listed herein, respectively, and to pay funds under Title IV programs and the GI Bill benefits/other VA education benefits listed herein. Therefore, each and every one of the claims Defendants submitted or caused to be submitted violated the FCA.  The violations were material in accordance with caselaw interpreting the term.

116.    In submitting or causing to be submitted such certifications and applications, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

117.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

118.    The Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 (adjusted for inflation) for each false claim they presented and caused to be presented for payment.

## SECOND CAUSE OF ACTION

### 31 U.S.C. § 3729(a)(1)(B)

### False Statements Material to False Claims

119.    Relators repeat and replead each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

120.    As set forth above, from at least 2011 to the present, and ongoing, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). Specifically, Defendants knowingly made, used, and caused to be made or used, false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs, in order to obtain eligibility to participate in Title IV programs and to receive Title IV funding, when in fact, Defendants' gainful

employment compensation practices did not and do not comply with Title IV of the HEA and its associated regulations in ways set forth in this Complaint above. In signing the PPAs, a duly authorized director or agent of LAFS and FS, at the direction of Heavener, Diana Derycz-Kessler or Paul Kessler, expressly certified that the FS or LAFS met gainful employment standards and that FS or LAFS "will not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of title IV, HEA program funds." These certifications were false because the University promotes and gives corresponding salary increases, demotes, and terminates enrollment sales reps based in any part, directly or indirectly, on their success in securing student enrollments.

121.    The Defendants also knowingly made, used, and caused to be made or used, false certifications regarding compliance with the requirements of the VA to obtain GI Bill benefits and other VA education benefits listed herein in, inter alia, their application to the SAA, when in fact Defendants' compensation practices did not and do not comply with VA regulations banning incentive compensation in ways set forth in this Complaint above.

122.    The Defendants knew they were paying employees based on their success in securing student enrollments and that their representations to the Government were false. Defendants' claims for Title IV funds and VA education funds based on these false representations are fraudulent. When the Defendants request, receive, and retain Title IV funds or VA education funds, Defendants know they are ineligible for those funds because of their intentional violations of the ICB.

123.    In making, using, or causing to be made or used such false records and statements, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

124.    These false records and statements were material to the ED's and the VA's decision to make FS or LAFS eligible for these financial aid programs and benefits, respectively, and to pay funds under Title IV programs as well as GI Bill benefits/other VA education benefits listed herein.  Therefore, each and every one of the claims Defendants submitted or caused to be submitted violated the FCA.  The violations were material in accordance with caselaw interpreting the term.

125.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

126.    The Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 (adjusted for inflation) for each false statement they made, used, or caused to be made or used that were material to a false or fraudulent claim.

## PRAYER FOR RELIEF

WHEREFORE, the Relators, on behalf of the United States and on behalf of themselves hereby pray that after a trial, this Court:

1.  On the First and Second Causes of Action, enter judgment holding the Defendants liable for the maximum amount of civil penalties, adjusted for inflation, for each violation of the False Claims Act committed by the Defendants jointly and severally;

2.  On the First and Second Causes of Action, enter judgment against the Defendants, jointly and severally, for three times the amount of damages sustained by the United States because of the acts of the Defendants;

3.  Award the Relators a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

4.  Award the Relators their costs and reasonable attorneys' fees incurred in prosecuting this action;

DATED:  June 20, 2024

Respectfully submitted,

KLEIMAN RAJARAM

By: _____
       Mark Kleiman

Attorneys for Plaintiffs/Relators
DAVID S. PHILLIPS and
BEN CHAIB

## **DEMAND FOR JURY TRIAL**

Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

DATED:  June 20, 2024

Respectfully submitted,

KLEIMAN RAJARAM

By: _____
       Mark Kleiman

Attorneys for Plaintiffs/Relators
DAVID S. PHILLIPS and
BEN CHAIB

Complaint for Violations of the Federal False Claims Act

Mark Kleiman (SBN 115919)
mark@krlaw.us
Pooja Rajaram (SBN 241777)
pooja@krlaw.us
KLEIMAN / RAJARAM
12121 Wilshire Blvd., Ste. 810
Los Angeles, CA  90025
Tel: 310-392-5455 / Fax: 310-306-8491

Attorneys for Plaintiffs/Relators

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| [UNDER SEAL],<br><br>          Plaintiffs,<br><br>   v.<br><br>[UNDER SEAL],<br><br>          Defendants. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729, *et seq*.]**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

**DOCUMENT TO BE KEPT UNDER SEAL**