UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA et al., <br><br>      Plaintiffs, <br><br>  v. <br><br> LOS ANGELES FILM SCHOOL, LLC et al., <br><br>      Defendants. | Case No. 2:24-cv-05214-SB-RAO <br><br><br> ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS [DKT. NOS. 61, 66] |

Plaintiff-Relators David S. Phillips and Ben Chaib filed this qui tam action alleging that the defendants engaged in schemes to obtain hundreds of millions of dollars in federal student aid and military benefits in violation of the False Claims Act (FCA). The United States declined to intervene, and the defendants now move to dismiss Relators' first amended complaint (FAC). The Court grants the motions.

I.

Defendant Los Angeles Film School, LLC (LAFS) is a for-profit college in Hollywood, California that receives more than $85 million annually in federal financial assistance. Dkt. No. 54 ¶ 5. Defendant Full Sail, LLC is a for-profit university in Winter Park, Florida that receives more than $377 million per year in federal financial assistance. *Id.* LAFS and Full Sail are partially jointly operated and have employed many of the same executives. *Id.* ¶¶ 26–30. Defendant James W. Heavener is a part owner of both LAFS and Full Sail, serves as the co-chair and Chief Executive Officer (CEO) of LAFS, and previously held similar positions at Full Sail. *Id.* ¶¶ 5, 17. Defendant Diana Derycz-Kessler served as the president and CEO of LAFS for 16 years until 2017 and was one of LAFS's owners, along with her husband, Defendant Paul Kessler. *Id.* ¶¶ 18, 21–22. Relator David S. Phillips served as LAFS's Vice President of Career Development from 2010 to 2017 and then as a consultant until 2022. *Id.* ¶¶ 23, 93, 108. Relator Ben Chaib served as LAFS's Vice President of Admissions from 2009 to 2016. *Id.* ¶ 24.

1

Relators allege that Defendants engaged in two schemes in violation of the FCA:  a pay-for-placement scheme and an incentive-compensation ban (ICB) scheme.

The pay-for-placement scheme, as alleged, involved efforts to meet the gainful employment requirements in 20 U.S.C. §1088(b)(1)(A)(i) (Title IV), which require institutions receiving federal funding to prepare students for gainful employment and place at least 70% of students in employment "in the recognized occupation for which [they were] trained."  20 U.S.C. §§ 1088(b)(1)(A)(i), (b)(2)(A)(ii) (defining program eligibility and requiring 70% "verified placement rate"); 34 C.F.R. § 668.8 (regulating calculation of placement rates).

Relators allege that LAFS and Full Sail could not meet the Title IV placement requirements because full-time jobs did not exist for many of their graduates, particularly for graduates of the audio recording programs.  Dkt. No. 54 ¶¶ 58, 66.  To avoid losing accreditation and funding, LAFS executives, including Heavener and Derycz-Kessler, allegedly devised a scheme to "artificially prop up [] placement rates" by generating short-term jobs.  *Id.* ¶ 71.  Specifically, LAFS funded third-party entities to hire graduates and offered vendors access to LAFS resources, including its campus and film equipment, at below-market rates in exchange for agreements to hire LAFS graduates.  *Id.* ¶¶ 62–63, 69–70.  Two of these third-party entities, Ivar Music Group and Heavy Harmony, were allegedly created at the direction of, or closely controlled by, Heavener and Derycz-Kessler.  *Id.* ¶¶ 87–99.  Heavener and Derycz-Kessler reviewed "nearly all communications" surrounding the formation of the pay-for-placement plan.  *Id.* ¶¶ 67, 73.

The ICB scheme allegedly involved violations of Title IV and the Veterans Administration's (VA) ban on incentive compensation, which prohibits participating institutions from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments."  20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22); 38 U.S.C. § 3696(d) (setting out prohibitions on incentive payments).  Relator Chaib alleges that in 2009, Defendant Heavener recruited him to design a compensation structure that would circumvent the incentive compensation ban while maximizing enrollment volume.  Dkt. No. 54 ¶ 121.  The resulting system, referred to as the Matrix, linked salary increases, promotions, and bonuses to enrollment quotas.  *Id.* ¶¶ 102, 122.  Admissions representatives who met their quotas received raises and perks, such as private offices and eligibility for highly paid overtime, which functioned as disguised bonuses.  *Id.* ¶ 123.  Conversely, those who failed to meet their quotas were placed on performance improvement plans to create a pretext for termination.

*Id.* ¶ 7.  To conceal these actions from regulators and avoid creating a paper trail, LAFS executives allegedly instructed staff to communicate about start numbers by text rather than email.  *Id.* ¶ 33.  Defendants also "sanitized" written compensation policies to remove explicit references to enrollment quotas while continuing to enforce them verbally.  *Id.* ¶ 123.[1]

The U.S. Department of Education (DOE) conducted an audit of LAFS beginning in 2017, which concluded in a settlement in 2020.  *Id.* ¶ 31; Dkt. No. 86 at 7.  An audit team visited LAFS's campus for several days in 2017 and subsequently requested additional information, including about LAFS's relationship with third-party vendors.  Dkt. No. 54 ¶¶ 31, 107, 110.  Defendants attach documentation from the audit to their motions, showing that DOE reviewed LAFS's "placement rate data" for the 2015 through 2019 funding award years. Dkt. Nos. 67-5, 67-7.  The records include email correspondence between LAFS's executives and DOE officials, in which LAFS represents that it does not have agreements with potential employers that "involve payments related to the placement of graduates."  Dkt. No. 67-9.  The emails also reference documentation provided to DOE in the course of the audit, including representative contracts, vendor payment lists, and budgets.  Dkt. No. 67-10.[2]

---

[1] Although Relators allege that Full Sail operated the "same false claims schemes," they do not specify how the schemes took place at Full Sail other than to allege that it offers below-market rate rentals to companies in exchange for hiring Full Sail graduates.  *Id.* ¶ 18.

[2] The records of the DOE audit are the subject of an ongoing Freedom of Information Act lawsuit between Relators' counsel and DOE.  Case No. 2:24-cv-06051-SB-RAO.  Defendants request that the Court take judicial notice of documents relating to the audit:  (1) a letter notifying LAFS of the program review; (2) an email from a DOE official to LAFS's Vice President of Operations requesting documentation; (3) the settlement agreement between DOE and LAFS; (4) DOE's "closeout" letter at the end of the review; and (5) communications between an LAFS executive and DOE.  Dkt. Nos. 67-5–67-10.  Relators did not oppose the request, and they reference the settlement agreement and the communications between LAFS and DOE in their motion to dismiss.  Accordingly, the Court takes judicial notice of these documents, but not of the truth of their contents. *See Plaskett v. Wormuth*, 18 F.4th 1072, 1084 n.6 (9th Cir. 2021) (taking judicial notice of the parties' correspondence with a federal agency where no party disputed the authenticity of the documents or objected to the requests).

The FAC asserts four causes of action under the FCA:  (1) false claims in violation of 31 U.S.C. § 3729(a)(1)(A) by LAFS, Heavener, and the Kesslers; (2) false claims by Full Sail and Heavener; (3) false statements material to false claims in violation of 31 U.S.C. § 3729(a)(1)(B) by LAFS, Heavener, and the Kesslers; and (4) false statements by Full Sail and Heavener.  Defendants move to dismiss the FAC based on standing, the statute of limitations, and the applicable pleading standards.

## II.

Defendants first move to dismiss the FAC for lack of standing under Rule 12(b)(1), arguing that Relators released their FCA claims when entering into separation and settlement agreements with LAFS.

## A.

A defendant may move to dismiss a complaint under Rule 12(b)(1) for lack of Article III standing to bring suit.  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  "The irreducible constitutional minimum of standing consists of three elements.  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Although in qui tam cases, the government, not the relator, has sustained the injury, the relator nonetheless has standing "because the [FCA] effects a partial assignment of the Government's damages claim . . . [that] suffices to confer standing on the relator."  *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008) (cleaned up).

The party invoking federal jurisdiction bears the burden of demonstrating standing.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021).  The quantum of evidence required to meet this burden depends on the stage of litigation.  *Maya*, 658 F.3d at 1068.  A jurisdictional challenge under Rule 12(b)(1) may be facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  A facial challenge "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Id*.  A factual challenge "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Id*.  In resolving a factual attack at the pleading stage, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness of the plaintiff's allegations."  *Id*. (citations

omitted).  Although Defendants do not address the proper framing of their standing challenge, their arguments challenge the truth of Relators' allegations and are therefore properly construed as a factual challenge.

B.

Relators Chaib and Phillips entered into agreements releasing certain claims against LAFS in 2021 and 2023, respectively.  On November 5, 2021, Chaib entered into a separation agreement releasing LAFS and its officers and shareholders from "all claims," including FCA claims.  Dkt. No. 67-2.  On May 18, 2023, Phillips entered into a settlement agreement to resolve separate litigation, in which he released "all claims" against LAFS and its affiliates, including FCA claims.  Dkt. No. 67-3.[3]  Relators do not dispute that they entered into these agreements, but they argue that the releases are not enforceable to bar FCA claims under Ninth Circuit law.

In *U.S. ex rel. Green v. Northrop Corp*, the Ninth Circuit "fashion[ed] a uniform common law rule to determine the validity of releases" in FCA cases.  59 F.3d 953, 962 (9th Cir. 1995).  The court held that "prefiling releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim."  *Id.* at 969.  The court reasoned that such releases would make the government "significantly less likely to learn of the allegations of fraud," which would contravene the "central purpose" of the FCA of "encouraging insiders privy to a fraud on the government to blow the whistle on the crime."  *Id.* at 963–65.  Two years later, the court distinguished *Green* in *U.S. ex rel. Hall v. Teledyne Wah Chang Albany* and enforced a prefiling release because "the federal government had already investigated the allegations" in response to administrative and state-court complaints the relator had previously filed.  104 F.3d 230, 233 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (Mar. 19, 1997).  The court concluded that the policy concerns identified

---

[3] Defendants request that the Court take judicial notice of Chaib's separation agreement and Phillip's settlement agreement.  Dkt. No. 67.  Relators have not objected to this request and do not dispute that the exhibits are accurate copies of their agreements.  Accordingly, the Court takes judicial notice of the agreements. *See, e.g.*, *Birdsong v. AT & T Corp.*, No. 12-CV-6175, 2013 WL 1120783, at *2 (N.D. Cal. Mar. 18, 2013) (taking judicial notice of release agreement that plaintiff did not dispute signing because "she would have no valid claims unless the release agreement did not bar them").

in *Green* were not present because "the government was aware of [relator's] allegations regarding false certifications" prior to his releasing his claims. *Id.*

Relying on *Hall*, Defendants argue that the releases are enforceable because DOE "had the opportunity to investigate . . . the very allegations at issue here" in its 2017 to 2020 audit, which included a review of LAFS's admissions office and its "placement activities and employability statements." Dkt. Nos. 75 at 11–13. In distinguishing *Green*, however, *Hall* relied on the fact that the government had "full knowledge" of the plaintiff's allegations. 104 F.3d at 233; *accord United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 24–25 (2d Cir. 2016) (reversing enforcement of releases where defendant's representations to the government were comprised of "half-truths and affirmative misrepresentations" and otherwise "did not make the government sufficiently aware" of the relator's allegations of fraud); *U.S. ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1167–68 (10th Cir. 2009) (adopting the *Green*/*Hall* framework and concluding that the facts resembled *Green* in that the government auditor had "full access" to the whistleblower); *U.S. ex rel. Radcliffe v. Purdue Pharma L.P.*, 600 F.3d 319, 332 (4th Cir. 2010) ("[T]he proper focus of the inquiry is whether the allegations of fraud were sufficiently disclosed to the government . . . .") (cleaned up).

Unlike in *Hall*, *Ritchie*, and *Radcliffe*, Relators are not alleged to have previously disclosed their fraud allegations to the government, and Defendants have not shown that the DOE audit uncovered the alleged schemes.[4] To the contrary, the FAC alleges that Defendants misled the DOE auditor and "conceal[ed] the very facts [the] regulators needed to make an informed decision" through falsified budgets and misstatements about LAFS's relationships with third parties who hired their graduates.[5] Dkt. No. 86 at 17; Dkt. No. 54 ¶¶ 105–114. Moreover, the settlement agreement does not identify the "program issues" addressed. Dkt. No. 67-7. Although the settlement requires LAFS to refrain from

---

[4] Defendants do not contend that DOE investigated Full Sail, and Defendants' counsel acknowledged at oral argument that the releases are unenforceable as to any viable FCA claims against that entity.

[5] Defendants argue that Phillips is "estopped from claiming knowledge about 'false statements' made to DOE" during the audit because his settlement agreement states that he had "no knowledge" of the "Program Review Report" or settlement agreement between LAFS and DOE. Dkt. No. 75 at 13. Defendants do not explain, however, how Phillips's disclaimer of knowledge as to those documents forecloses allegations about misrepresentations made to DOE in the audit.

"arrang[ing] for jobs or gigs" for graduates through third parties, the record contains no evidence about the scope of any violations that DOE identified relating to that practice. *Id.* Nor does anything in Defendants' briefing suggest that the DOE audited incentive compensation. The fact that the audit may have examined the LAFS admissions and placement departments—areas implicated in the alleged misconduct—is insufficient, on this limited record, to show that the "allegations of fraud were sufficiently disclosed to the government." *Radcliffe*, 600 F.3d at 332; *see Ladas*, 824 F.3d at 24–25.[6]

   In sum, Relators have plausibly alleged that the fraud underlying this FCA action was not sufficiently disclosed to the government before they released their claims. The releases are therefore unenforceable, and Relators have met their burden of establishing standing. *See U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 481 F. Supp. 2d 815, 821 (S.D. Tex. 2007) (denying summary judgment based on prefiling releases where there were "at least a material issue of fact as to the government's having 'full knowledge' of the charges") (quoting *U.S. ex rel. Hall*, 104 F.3d at 232).[7] This ruling does not foreclose Defendants from renewing

---

[6] Defendants argue that DOE knew about the pay-for-placement issue based on communications purportedly showing that LAFS fully disclosed its relationship with third-party vendors as part of the audit. Dkt. No. 75 at 5–6, 14; Dkt. No. 67-4. Yet those communications to DOE are themselves alleged to contain misrepresentations. Dkt. No. 54 ¶¶ 105–06, 113, 123; *compare id.* ¶¶ 77–99 (alleging that Heavy Harmony was an entity controlled and funded by LAFS and its executives to create jobs for graduates and whose ownership they concealed) *with* Dkt. No. 67-4 (email to DOE describing Heavy Harmony as "a music publishing company hired to conduct a music publishing seminar" that "unbeknownst to LAFS, may have hired a graduate"); *compare* Dkt. No. 67-10 (email from LAFS executive Jenna Langer to DOE about LAFS's relationships with third-party vendors) *with* Dkt. No. 54 ¶ 87 (alleging that Langer was not informed of the "hiring arrangements" with third parties, "at Derycz-Kessler and Heavener's insistence"); *compare* Dkt. No. 67-10 (email from LAFS executive to DOE stating that LAFS was not "involved in the creation or business" of Ivar Music Group) *with* Dkt. No. 54 ¶ 90–97 (alleging that Heavener and Derycz-Kessler directed the formation of Ivar and internally promoted it as a "graduate job placement" opportunity).

[7] Because the Court concludes that the releases are unenforceable, it does not consider Relators' alternative argument that the FCA claim is not within the scope of the release in Phillip's settlement. Dkt. No. 86 at 15.

their standing challenge at a later stage if discovery shows that the alleged fraud was previously disclosed to the government. *See Nat'l Ass'n of Home Builders of U.S. v. City of Los Angeles*, 1997 WL 312604, at *1 (9th Cir. 1997) (noting that a defendant who raises an unsuccessful standing challenge at the motion to dismiss stage "would not be precluded from raising the standing issue by summary judgment motion").

## III.

Defendants next challenge the merits of Relators' claims under Federal Rule of Civil Procedure 12(b)(6). They argue that Relators' claims are barred by the statute of limitations and that they fail to allege their claims with sufficient specificity under Federal Rules of Civil Procedure 8 and 9(b).

## A.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 8. A claim is plausible when the pleaded facts allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating the motion, the court accepts all well-pleaded factual allegations as true but disregards legal conclusions and "[t]hreadbare recitals of the elements of a cause of action." *Id.* (cleaned up). Assuming the veracity of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. In addition, FCA claims must satisfy the heightened pleading standard for fraud claims, which requires a plaintiff to "state with particularity the circumstances constituting fraud"— "identify[ing] the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." Fed. R. Civ. P. 9(b); *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011); *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013).

A claim under the FCA requires a showing of: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, (4) causing the government to pay out money or forfeit money due. *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017); *see* 31 U.S.C. § 3729(a). Defendants argue that the FAC fails to state a claim because it (1) does not identify any false claims with specificity, (2) does not allege violations of Title IV and VA requirements or establish that such violations are material to

the disbursement of funds, (3) does not sufficiently allege knowledge on the part of the individual Defendants, and (4) does not allege FCA violations by Full Sail and Paul Kessler.

B.

Relators do not meaningfully oppose Defendants' arguments that the FAC fails to allege violations of the gainful employment requirements and incentive compensation ban or to establish that any such violations were material to the disbursement of funds.[8]  Their failure to do so is dispositive.  *See United States v. Bourseau*, 531 F.3d 1159, 1170–71 (9th Cir. 2008) (recognizing that materiality is an element of FCA claim); *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 997 (9th Cir. 2010) ("It is the false certification of compliance [with laws, rules, or regulations] which creates liability when certification is a prerequisite to obtaining a government benefit").  Defendants argue that the alleged conduct—including misreporting placement rates and providing non-monetary "perks"—did not violate Title IV or VA eligibility requirements.  Relators also do not address that threshold issue.  Instead, they focus on whether DOE had complete knowledge of the fraud, failing to address whether the FAC plausibly alleges a material violation of the applicable regulations.  *See* Dkt. No. 86 at 9–12.  Rather than respond to Defendants' arguments, Relators request leave to amend to bolster their allegations, effectively conceding the FAC's deficiencies.  *See Edelmania Prods., LLC*, 2023 WL 8114860, at *4; *Shorter v. L.A. Unified Sch. Dist.*, 2013 WL 6331204, at *5 (C.D. Cal. Dec. 4, 2013) (gathering cases and holding that failure to oppose a motion to dismiss on certain issues "should be construed as a waiver or abandonment of those issues warranting dismissal").

Given this concession, the Court need not reach the other challenges to the pleadings, including Defendants' arguments that Relators' claims are barred by the statute of limitations.  The Court notes, however, that the allegations against Full Sail and Paul Kessler appear independently deficient.  Rule 9(b) "requires plaintiffs to differentiate their allegations when suing more than one defendant." *United States v. Corinthian Colleges*, 655 F.3d 984, 997–98 (9th Cir. 2011).  Yet the FAC relies largely on group pleading to attribute LAFS's alleged misconduct to Full Sail.  *See, e.g., id.* ¶ 5 ("the same false claims schemes are operated at both locations").  And although the FAC alleges that Paul Kessler helped generate jobs

---

[8] Relators also fail to oppose Defendants' arguments about the lack of gainful employment requirements for VA funding and whether violations of the California Education Code can serve as a basis for an FCA claim.

9

for graduates through third-party vendors (Dkt. No. 54 ¶¶ 22, 143–46), it contains no allegations that he knew those jobs would be used to submit false claims to the government or that he had oversight or control over the submission of such claims. *See United States ex rel. Humane Soc'y of the U.S. v. Westland/Hallmark Meat Co.*, No. 08-CV-00221-VAP, 2010 WL 11464786, at *10–11 (C.D. Cal. Aug. 5, 2010) (noting that although persons acting in concert may be jointly liable under the FCA, this does not affect a relator's "obligation to plead, with sufficient particularity, that the persons acted together to submit false claims" which "necessarily includes allegations of each person's actions in doing so"); *Corinthian Colleges*, 655 F.3d at 998 (dismissing claims against board members where complaint failed to allege they "participated in certifying [] compliance to the DOE").  If Relators amend their complaint, they should assert claims against Full Sail and Paul Kessler only if they can do so consistent with Rule 11.

IV.

For the reasons stated above, the motions to dismiss are granted.

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  Leave may be denied, however, for reasons such as "repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Relators represented to the Court at the mandatory scheduling conference that the FAC would represent their "best shot" at pleading their claims, yet they now seek further leave to amend to bolster their allegations.  Because this is the first ruling on the merits of Relators' claims, and given the liberal policy favoring amendments, the Court will grant Relators an opportunity to amend any claims if they have a good-faith factual and legal basis to do so.  *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).  Relators shall file their SAC by March 23, 2026.  However, Relators should not expect another opportunity to amend to add allegations that could have been raised in the second amended complaint (SAC).  Future concessions about the insufficiency of the pleadings, as well as failures to meaningfully oppose arguments on dispositive issues, will result in dismissal.

Date: March 9, 2026

_____
Stanley Blumenfeld, Jr.
United States District Judge

10